IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : Cr. A. No. 19-101-LPS |
| AARON DAVIS, | : |
| Defendant. | : |

## MEMORANDUM ORDER

Defendant, Aaron Davis ("Davis" or "Defendant"), is charged in a five-count indictment with two counts of bank fraud, two counts of wire fraud, and one count of money laundering. (D.I. 3) The grand jury returned the indictment on August 6, 2019. (*Id.*) On May 18, 2020, the Court scheduled a jury trial for November 18, 2020. (D.I. 23) On September 4, 2020, the Court rescheduled the jury trial to November 16, 2020, anticipating that jury selection could take longer than it would have in pre-pandemic conditions. (*See* D.I. 48 at 16-17) ("Sept. 4 Tr.")

Due to the impact of the ongoing COVID-19 pandemic, the Court recently received multiple filings from the parties and had several discussions with them, focused on whether the jury trial should actually go forward in November. (*See, e.g.*, D.I. 41, 43, 44, 49, 50) Over the course of a lengthy in-court hearing with Defendant present, the Court determined on October 13, 2020 that trial would, indeed, begin with jury selection on November 16, 2020. (*See* D.I. 44 at 22) ("Oct. 13 Tr.")

The Court also explained during the October 13 proceeding that it was granting the government's modified motion to permit certain of its fact witnesses to testify at trial live via remote videoconferencing technology. (*Id.* at 24) The Court stated at the hearing that it was

1

granting the motion for reasons it would further explain in writing in due course. (*Id.*) This Order provides that explanation.[1]

## *The Government's Motions*

During a status teleconference on September 4, 2020, the government indicated that it would seek the opportunity to depose certain of its anticipated fact witnesses to preserve their testimony in the event that they were ultimately unavailable to testify live at trial. (*See* Sept. 4 Tr. at 3-4) As Defendant anticipated he would likely oppose the government's request, the Court set a schedule for the government to file an appropriate motion and for the parties to brief it. (*See id.* at 11)

Consistent with that schedule, on September 10, the government filed a Motion to Conduct Rule 15 Depositions. (D.I. 32) ("Original Motion") In its Original Motion, the government sought, pursuant to Federal Rule of Criminal Procedure 15, depositions of four witnesses, whom it identified as D.S., J.A., R.S., and a witness representing entity H.B. (*Id.* at 2-3) In the alternative, the government requested that each of these witnesses be permitted to testify live during trial but via remote videoconferencing technology, which would eliminate the need for the witnesses to travel to Delaware and appear in the courtroom. (*Id.* at 10-11)

Subsequently, the government modified its motion in two respects. First, it expanded the number of witnesses for whom it sought relief from four to seven. Specifically, during an October 1 teleconference on the government's Original Motion, the government requested to add three unnamed witnesses, whom it identified as "representative[s] of Company A," likening their

---

[1] The Court also adheres to the reasoning it gave during the October 13 hearing for why it is granting the government's motion and for why it is proceeding with trial next month rather than continuing it to 2021 (as Defendant preferred). (*See* Oct. 13 Tr. at 22-25) This Order supplements but does not supplant the statements made during the hearing.

2

situations to that of the witness representing H.B. (D.I. 49 at 3-4) ("Oct. 1 Tr.")[2] Second, during the October 13 in-person hearing, the government withdrew its request for Rule 15 depositions (citing the fact that trial was now little more than a month away) and asserted solely what had previously been its alternative request: that all of the witnesses at issue (now seven) be permitted to provide live trial testimony from remote locations using videoconferencing technology. (Oct. 13 Tr. at 18)[3] The Original Motion, as modified orally in these two respects, is the motion the Court considered and granted at the October 13 hearing. It will be referred to hereinafter as the "Modified Motion."

***Defendant's Opposition***

Defendant opposed the Original Motion and opposes the Modified Motion. (*See* D.I. 33 at ¶ 14; Oct. 13 Tr. at 6) Defendant argues that the proposed testimony of J.A. and the H.B. witness is not material but is merely "contextual," having "no direct bearing on any element that the government must prove." (D.I. 33 at ¶ 6) (citing D.I. 32 Ex. A) Defendant further disputes whether the witnesses are "unavailable" to testify at trial in the sense pertinent to an analysis under Rule 15. (*See* D.I. 33 at ¶¶ 7-12) Defendant also raises specific objections with respect to

---

[2] Defendant faults the government for repeatedly expanding the number of witnesses at issue, characterizing the motion as "mushrooming." (*See, e.g.*, Oct. 13 Tr. at 6) When the government first broached the topic of depositions, it referred to only two witnesses (H.B. and J.A.). (*See* D.I. 33 at ¶ 1) Then the Original Motion was directed to four witnesses, and eventually the Modified Motion was directed to seven. While, of course, it would have been preferable if the government had better anticipated the full scope of its requests from the beginning of its discussions with defense counsel, the Court does not view the government's modifications as having any material impact on the proper resolution of the Modified Motion. The issues presented by the recently-added witnesses are not substantially different from those presented by the first two witnesses mentioned by the government (H.B. and J.A.) and Defendant has had a full and fair opportunity to state all his objections to all of the witnesses.

[3] Although not yet determined, it is anticipated that each witness will testify from either his or her nearest federal court or United States Attorney's Office. (*See* D.I. 32 at 10; *see also* D.I. 43 at 2)

3

witness D.S., whom Defendant does not view as simply an alleged victim of Defendant's fraud but, instead, as a potential fraudster herself. (*Id.* at ¶¶ 13-14) The circumstances surrounding D.S. make her, in Defendant's view, a particularly unsuitable witness for a remote examination. (*See id.*; Oct. 1 Tr. at 7)[4]

***Applicable Law***

Neither the parties nor the Court has found any controlling Third Circuit law concerning the use of remote videoconferencing technology to provide live witness testimony during a jury trial in a criminal case. Under the circumstances, the Court finds the analytical framework of Federal Rule of Criminal Procedure 15 to be highly instructive. As the Second Circuit has observed, satisfaction of Rule 15's requirements for a deposition may also justify the use of live, remote trial testimony, as the latter "afford[s] greater protection of [a defendant's] confrontation rights than would have been provided by a Rule 15 deposition." *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999).

Rule 15 provides that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1).

In evaluating whether the required "exceptional circumstances" are present, the Third Circuit has directed that courts consider (i) the materiality of the testimony and (ii) the unavailability of the witness. *See United States v. Ismaili*, 828 F.2d 153, 159 (3d Cir. 1987). The materiality requirement is met if the testimony is "highly relevant to a central issue in the case." *United States v. Drogoul*, 1 F.3d 1546, 1556 (11th Cir. 1993). "A potential witness is

---

[4] The Court does not describe nor analyze Defendant's objections that pertain only to depositions, since the government has withdrawn its request for depositions.

4

unavailable for purposes of Rule 15(a) whenever a substantial likelihood exists that the proposed deponent [i.e., witness] will not testify at trial." *United States v. Fleet Mgmt. Ltd.*, 2007 WL 2463364, at *1 (E.D. Pa. Aug. 28, 2007) (citing *Drogoul*, 1 F.3d at 1553). Even where exceptional circumstances exist, and the government has proven both materiality and unavailability, the Court may further consider whether significant countervailing factors would nevertheless render unjust the accommodation sought by the government. *See Drogoul*, 1 F.3d at 1552.

***Exceptional Circumstances Are Present***

The Court finds that exceptional circumstances exist to permit live testimony via remote videoconferencing technology from all seven witnesses identified by the government. The government has demonstrated that the testimony of these witnesses will be material to its case and that these witnesses are not available to travel to Delaware for trial.

First, the testimony of each proposed witness is material to the government's case-in-chief. The witnesses are all victims of Defendant's alleged fraud. Each witness' testimony is highly relevant to at least one of the central issues in the case, as each witness' testimony is probative of a criminal charge the government is attempting to prove beyond a reasonable doubt.

More specifically, R.S. and D.S. will testify about unauthorized payments made to Defendant or his business (All American Auto ("AAA")) through various banking institutions, which is material to the government's bank fraud charges. (D.I. 32 at 2, 4, 7) J.A. will testify about the misuse of his address, date of birth, and social security number on an application for social security benefits, which is material to the government's charge of wire fraud involving the Social Security Administration. (*Id.* at 3, 5, 7) H.B.'s representative, as well as the three representatives of Company A, will testify about a business email compromise scheme that

5

involved payments intended for H.B. from Company A that were allegedly fraudulently misappropriated by Defendant, which is material to the government's wire fraud charge. (*Id.* at 2, 5, 7; *see also* Oct. 1 Tr. at 3-4)

It is true, as Defendant points out, that the government has at times characterized the testimony of some of the seven witnesses – including J.A. and H.B. – as "contextual." (D.I. 33 at ¶ 6) (citing D.I. 32 Ex. A) Defendant states that the testimony of at least J.A. and H.B. "has no direct bearing on any element that the government must prove." (*Id.*) But testimony may be material even if it is not "definitive proof of guilt or innocence." *United States v. Al Fawwaz*, 2014 WL 627083, at *1 (S.D.N.Y. Feb. 18, 2014). In a fraud case such as this, testimony from a victim is not a prerequisite to a finding of guilt, but the "context" a victim can provide can be probative of guilt and may assist the government in meeting its burden of proof. *See generally United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2005) (finding that testimony from fraud victims can show series of fraudulent transactions). Among other things, all seven witnesses' testimony is material because it tends (if credited by the jury) to disprove potential defenses such as mistake, accident, or lack of intent. (*See* D.I. 32 at 7)

Second, the Court is persuaded that each of the seven witnesses is not available to travel to Delaware to testify at trial. The government has demonstrated that, due to the impact of the coronavirus pandemic (especially on long-distance travel), these witnesses should not, and are not expected to, leave their homes and communities to get to Delaware less than four weeks from now.

According to the Centers for Disease Control and Prevention (CDC), COVID-19 is a respiratory disease spreading from person to person "through respiratory droplets or small particles, such as those in aerosols, produced when an infected person coughs, sneezes, sings,

6

talks, or breathes."[5] These particles can then be inhaled into the nose, mouth, airways, and lungs of people who are nearby and can cause a viral infection.[6] Spread of the COVID-19 virus commonly happens when people are in close contact with one another (within about 6 feet).[7] Thus, the CDC recommends that people put 6 feet of distance between themselves and people who do not live in their household.[8]

During air travel, practicing social distancing is difficult, and it may not be possible to avoid sitting within six feet of others.[9] In addition, air travel requires spending time in airport terminals and security check lines, which can bring people in close proximity with other people and with frequently-touched surfaces, potentially increasing the chance of exposure to the virus.[10]

All seven witnesses at issue in the government's Modified Motion live far away from Delaware. Specifically, they are each between 611 and 2,706 miles from the courthouse in Wilmington, Delaware.[11] It is nearly certain that most or all of the seven witnesses would need

---

[5] *See* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Spread.

[6] *See id.*

[7] *See id.*

[8] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[9] *See* https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html.

[10] *See id.*

[11] D.S. is located in Lawrenceville, Illinois, 775 miles from Wilmington, Delaware; R.S. is located in Fort Wayne, Indiana, 611 miles from Wilmington; J.A. and the H.B. witness are located in Los Angeles, California, 2,706 miles from Wilmington; and the Company A witnesses are in California, at least several thousand miles from Wilmington. (*See* D.I. 32 at 8; Oct. 1 Tr. at 4)

7

to travel by air to appear at trial. If a witness chose an alternative method of travel, the length of time that witness would be travelling (and potentially exposed to additional risk of exposure) would be greater.

Several of the witnesses identified by the government are also at heightened risk of serious consequences were they to contract coronavirus. R.S., J.A., and D.S. are at least 66 years old. (D.I. 32 at 8) Among adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.[12] The CDC has reported that 80% of the individuals who have died of COVID-19 in the United States have been adults aged 65 or older.[13] One of these three witnesses (the government does not say which) also recently underwent significant medical surgery, making long-distance travel even more challenging (if even possible) for this witness. (D.I. 32 at 8 n.1)

The four witnesses who live in California (the representatives of H.B. and Company A) would almost certainly fly to the east coast, requiring them to be on a plane for many hours, in both directions. In general, according to the CDC, "the more people you interact with, the more closely you interact with them, and the longer that interaction, the higher your risk of getting and spreading COVID-19."[14] While none of these four representative witnesses is elderly or suffers from a health condition making them especially vulnerable to severe consequences from coronavirus (*see* D.I. 32 at 8; Oct. 1 Tr. at 4), they would each have to engage in cross-country

---

[12] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[13] *See id.*

[14] *See id.*

8

travel, twice, to provide trial testimony that, in total (among all seven witnesses combined), is likely to last no more than half a trial day.

The Court is not finding (nor is it qualified to do so) that travel is impossible or that people should not travel. Nor is it finding (or have a basis to find) that all of the witnesses, if subpoenaed to testify at trial, will refuse to travel. Instead, the Court is merely concluding that each of the seven witnesses identified by the government is – based principally on a combination of his or her distance from Delaware and his or her particularized risk factors – properly viewed, under current conditions and those likely to exist next month at the time of trial, as "unavailable" to testify at trial. *See generally United States v. Donziger*, 2020 WL 4747532, at *3 (S.D.N.Y. Aug. 17, 2020) ("At least in some instances, allowing remote testimony may be needed to promote the strong public interest in . . . minimizing further spread of the virus."); *United States v. Karoly*, 2009 WL 1872083, at *2 (E.D. Pa. June 29, 2009) (holding that age, medical concerns, and need to travel long distances are factors to consider in evaluating Rule 15 request). The government has proven a substantial likelihood that each of the seven witnesses will not likely attend trial in person.[15]

Hence, exceptional circumstances are present and warrant granting the relief requested by the government.

---

[15] The Court agrees with Defendant that it must make individualized determinations of the presence of exceptional circumstances, witness by witness. (*See, e.g.*, D.I. 33 at ¶ 7; *see also United States v. Lucas*, 516 F.3d 316, 348 (5th Cir. 2008)) The Court has done so. In the context of the Modified Motion before the Court, it turns out that many of the pertinent factors (e.g., the impact of the pandemic, particularly on long-distance interstate travel) are the same for each of the witnesses. For simplicity, the Court addresses such overlapping factors just once, but the Court's discussion applies to all of the involved witnesses.

*Countervailing Factors Do Not Outweigh the Exceptional Circumstances*

Defendant has not identified significant countervailing factors that render the accommodation sought by the government unjust.[16]

The bulk of Defendant's opposition to the government's Modified Motion relates to witness D.S. While the government portrays her as a victim of Defendant's alleged fraud, Defendant contends that D.S. herself has an extensive history of alleged fraudulent activities and speculates that the government may have reached an immunity agreement with her. (D.I. 33 at ¶ 14) Defendant insists, thus, that D.S. "deserves to be in the courtroom" when she testifies, as examination of her will "lose something via remote transmission." (Oct. 1 Tr. at 7)

The Court is confident that the procedures it will use for testimony via remote videoconferencing technology will adequately and appropriately preserve the essential characteristics of the face-to-face confrontation of a witness that occurs during live testimony in a courtroom. In full view of the jury, D.S. will be sworn in; will be examined directly by government counsel; and will then be subjected to cross-examination by defense counsel. The jury will be able to evaluate D.S.' credibility and veracity through her words as well as her demeanor and comportment. The Court, like the jury, will be able to observe D.S.' testimony and will address in real-time any objections or other issues that may arise. On her end, D.S. will receive a video feed of the courtroom.

---

[16] The Court will carefully instruct the jury as to all of the precautions it is taking to conduct the trial in a safe manner. In that context, it will provide an appropriate and neutral explanation that certain witnesses who were unable to attend trial in person are testifying remotely and that their testimony should be considered the same as that of all other witnesses, just as if the witnesses had appeared in the courtroom. The parties will soon be submitting their proposed jury instructions (*see* D.I. 43 at ¶ 2(E)) and in that submission will have an opportunity to provide the Court with suggestions as to precisely what the jury should be told. The instructions the Court will give the jury will ensure that, contrary to Defendant's fear, it will not "appear[] that justice has been cooked against the defendant with the Court's permission." (D.I. 33 at ¶ 14)

10

The comparison to the pre-COVID-19 decision of the Second Circuit in *Gigante* is informative and fully supports the Court's conclusions. In *Gigante*, the appeals court affirmed a district court's decision to permit a witness – who was "medically unsafe . . . to travel to New York for testimony" – to testify via two-way, closed-circuit television from a remote location. *See* 166 F.3d at 79-80. The *Gigante* court found that defendant "forfeited none of the constitutional protections of confrontation" because remote testimony "preserved all of [the] characteristics of in-court testimony," including (1) the giving of testimony under oath; (2) the opportunity for cross-examination; (3) the ability of the factfinder to observe demeanor evidence; and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in the presence of that defendant. *Id.* at 80.

Over the past few months, the undersigned Judge has presided over three remote bench trials using videoconference technology like that which will be used at the forthcoming trial in the instant matter. It has been the Court's experience, while sitting as a factfinder, that this technology allows for thorough and effective examinations, including challenges to credibility. The Court fully expects that the jury will similarly be provided the evidence it needs, including through the remote testimony of the seven witnesses involved in the government's Modified Motion, to assess credibility and reach a just verdict consistent with the evidence.

***Conclusion***

The Court concludes that permitting the seven witnesses to testify live from remote locations during the upcoming jury trial, using videoconferencing technology, is justified by the presence of exceptional circumstances and is in the interests of justice.

Accordingly, for the reasons given above as well as those stated by the Court during the October 13 conference (*see, e.g.*, Oct. 13 Tr. at 24), IT IS HEREBY ORDERED that the government's Modified Motion (D.I. 32) is GRANTED.

October 23, 2020
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

12